**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| **Sol-Ark, LLC,** *Plaintiff*, | |
| **v.** | **CASE NO. 4:26-cv-00225** |
| **Ford Motor Company,** *Defendant.* | **Jury Trial Demanded** |

## ORIGINAL COMPLAINT

Plaintiff, Sol-Ark, LLC ("Plaintiff" or "Sol-Ark"), files this Complaint against Defendant, Ford Motor Company ("Defendant" or "Ford"), and in support states as follows:

## INTRODUCTION

1. This action arises from Ford's deliberate theft and misappropriation of Sol-Ark proprietary information, advanced solar, inverter, and energy storage technologies, trade secrets, and know-how. All done so that Ford, at Sol-Ark's expense, could get a foothold in a specialized market in which it has failed time and again, in a segment in which it has taken more than $20 billion in write-downs in 2025 alone, and in a sector previously inaccessible to Ford.

2. Because of Ford's actions, Sol-Ark brings claims for Fraudulent Inducement, Tortious Interference, Unfair Competition by Misappropriation, Misappropriation of Trade Secrets, Violation of Defend Trade Secrets Act 18 USC § 1836, Conversion, Quantum Meruit, and Unjust Enrichment.

3. Despite its public image as an industry leader, Ford's electric vehicle (EV) and home energy products and efforts have been a catastrophic financial and technological failure. Unable successfully to innovate in-house, Ford embarked on a predatory pattern of inducing

leading technology companies like Sol-Ark into "supplier agreements," promising millions of dollars in revenue and untold benefits from a Ford affiliation. Ford's true, underlying intent was entirely different. It entered into a relationship with Sol-Ark for the purpose of extracting proprietary know-how from Sol-Ark to help salvage Ford's failing EV programs, keep a potential competitor locked down while diverting that competitor's limited resources, and offload whatever research and development expenses it could to a third party.

4. Ford's failure in the EV and home energy sectors speaks for itself. It is evidenced by just a few public examples that reflect staggering financial losses and radical strategic retreats:

a. *Widening Losses*: Ford's Model e division lost $5.1 billion in 2024 alone, following a $4.7 billion loss in 2023. As of late 2025, the division was projected to lose an additional $5.5 billion for the year, with losses exceeding $1.4 billion per quarter.

b. *Massive Write-Downs*: In December 2025, Ford announced a massive $19.5 billion write-down and special charge related to its wholesale retreat from pure EV plans. This included an $8.5 billion hit specifically for canceling planned EV models and a $6 billion charge for dissolving battery joint ventures.

c. *Strategic Failures*: Ford has been forced to cancel or indefinitely delay core projects, including its three-row EV SUV, its next-generation T3 electric truck, and the flagship F-150 Lightning pure electric model, which was officially halted in late 2025.

5. Recognizing that it lacked the specialized knowledge to bridge the gap between standard automotive batteries and home energy ecosystems, Ford persuaded Sol-Ark—a

recognized innovator in solar and energy storage solutions—to enter into first a non-disclosure agreement and then a supply agreement with false promises and unkept commitments. Ford's primary objective was not a long-term partnership, as it told Sol-Ark. Instead, Ford was pursuing a "knowledge heist" intended to allow it to learn, copy, misappropriate, and repurpose Sol-Ark's advanced solar, inverter, and energy storage technologies, trade secrets, know-how, and specialized techniques. And, in the process, consume extensive Sol-Ark engineering resources, deceive it into investing significant capital in Ford-focused equipment and products, handcuff it from seeking other opportunities, and delay new product introductions. This knowledge transfer gambit continued until one day, without warning, Ford simply informed Sol-Ark that the project was over. Over the course of more than two years, Sol-Ark had numerous engineering meetings each week with Ford teams to show Ford how to architect and design parts of a system that would completely replace home energy storage devices (a system that Sol-Ark currently manufactures & sells). But after all of Sol-Ark's work and investment, it was pushed aside while Ford—with Sol-Ark's solutions in hand—strove for relevance in the EV, solar, battery, and home energy markets.

## PARTIES

6. Plaintiff Sol-Ark is a limited liability company organized under the laws of Delaware, having a primary place of business at 805 South Central Expressway, Allen, Texas.

7. On information and belief, Defendant Ford Motor Company is organized under the laws of the State of Delaware with its principal place of business at One American Road, Dearborn, Michigan. Defendant is registered to do business in Texas. Sol-Ark requests that summons be issued and served upon Defendant through its registered agent, CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX 75201.

## JURISDICTION AND VENUE

8. This Court has original subject matter jurisdiction under 28 U.S.C. § 1331 over Sol-Ark's claims pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(b). This Court has supplemental jurisdiction over the Texas state law claims pursuant to 28 U.S.C. § 1367, because the state law claims are so related to the claims pursuant to the Defend Trade Secrets Act that they form part of the same case or controversy and derive from a common nucleus of operative facts.

9. This Court has personal jurisdiction over Ford because Ford has minimum contacts with Texas and this district such that this venue is a fair and reasonable one. Ford conducts substantial business in this forum, including regularly doing or soliciting business, engaging in other persistent courses of conduct, and/or deriving substantial revenue from goods and services in Texas and this district, as described below.

10. This Court has personal jurisdiction over Ford because Ford has committed tortious acts against Sol-Ark in this district. Ford knew that Plaintiff was located in this district and knowingly and purposefully availed itself to this district by intentionally contacting Plaintiff in this district and interacting with Plaintiff as described in this complaint. For example, Ford employees met with Plaintiff at Plaintiff's headquarters in this district as part of the acts described in this complaint.

11. Likewise, this Court has personal jurisdiction over Ford because its attempts to harm Sol-Ark's reputation potentially threatened Sol-Ark's relationships with numerous Sol-Ark customers, clients, employees, lenders, and potential investors, including those in Texas.

12. Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred herein, because a substantial part of the property that is subject of the action—that is, Sol-Ark's business, intellectual property assets, technological

developments, and manufacturing—is situated in the district, and because Ford is subject to personal jurisdiction in this district.

## FACTUAL BACKGROUND

**Sol-Ark.**

13. Sol-Ark is a leading, U.S.-based provider of solar and energy storage solutions for the residential, commercial, and industrial markets, manufacturing innovative hybrid inverters from its facility in Allen, Texas. Its products have won numerous industry awards, and the company has been consistently recognized for superior customer service and solar technology leadership as reflected in the more than six generations of innovative inverter products that it has developed and marketed. Indeed, Sol-Ark was the first U.S. company to design and manufacture a whole new class of high efficiency storage inverters referred to as "Hybrids."

14. Founded in 2013, Sol-Ark has been financed and built from the ground up by two entrepreneurs, Tom Brennan (national winner of the 2023 EY Entrepreneur of the Year Award) and Bhawna Oberoi (a veteran of the U.S. Army). Using their own funds, they pursued the American dream that became Sol-Ark. Following through on the Founders' vision for the future, the company has invested heavily in its community, forming "Sol-Ark® Cares" to support solar energy projects, empower underserved communities, and promote environmental stewardship. Sol-Ark's hybrid inverter technologies and home energy management systems have garnered extensive industry recognition, making it a pioneer in this important and developing sector, including:

- Finalist for 8K Hybrid Inverter (https://www.ees-europe.com/news/ees-award-2019-finalists-impress-with-pioneering-products-and-solutions), which is attached as Exhibit A.
- American Made Solar Prize Semi-Finalist for Virtual Power Plaint Solutions (https://www.solarpowerworldonline.com/2020/02/sol-ark-virtual-power-plant-solution-doe-solar-competition/), which is attached as Exhibit B.

- Honorable Mention in Residential category for Premium 18K-2P Hybrid Inverter (https://www.solarpowerworldonline.com/2025-residential-honorable-mention-awards/), which is attached as Exhibit C.

**Ford.**

15. Ford is a household name, carrying the Ford family name for more than 120 years. The company has a long history of manufacturing gasoline-powered automobiles, using combustible engines and technologies. Its recent financial performance confirms that it has no successful history in the EV or home energy sectors; more relevant, it had no known history in the solar or hybrid inverter or home energy storage sectors before its engagement with Sol-Ark.

16. For many years, Ford struggled to find a foothold in the fast-developing EV sector. Outpaced by Tesla and other high-growth competitors in the EV market, Ford needed to move fast to achieve relevance. Ford began to invest billions of dollars into its EV efforts. Despite those efforts and investments, Ford continued to fail and to fall further and further behind its competitors.

17. For example, in April 2022, Ford began full production of its F-150 Lightning trucks. Ford touted that "[a]t home, F-150 Lightning, together with a home integration system, can power a house during an outage for three days and in time will be able to offer power back to the grid." https://corporate.ford.com//articles/products/f-150-lightning/, which is attached as Exhibit D. Ford explained that "[h]ome charging is straightforward with installation partner Sunrun." *Id.*

18. While the all-electric F-150 Lightning truck was a big deal to Ford, once it actually hit production lines and was offered to the public, it was an abysmal failure. Ford was never able to sell the F-150 Lighting truck for anywhere close to the promised low price tag. The F-150 Lightning truck also struggled with reliability as a power source, and Ford lost money on every vehicle.

19. Ford faced a choice. Either gain traction quickly to advance in the EV and home energy sectors or become a dinosaur in an ever evolving, lucrative market.

20. But there was a big problem. Ford had no idea how to make that happen, especially within the compressed time frames it faced to bring a product to market while facing stiff competition from both domestic and foreign manufacturers. Ford needed external expertise, technologies and experience to help it design, develop, and deliver a commercially viable product.

**Ford Pursues Sol-Ark's Expertise.**

21. The ideas and concepts related to the use of EVs for home power were not new. But enabling and implementing those solutions requires sophisticated engineering know-how and technical experience, especially when dealing with high voltage energy systems in the home that could easily kill a person or start a fire if designed or installed improperly.

22. Ford, with no internal ability to develop a system of vehicle-based back-up home generators, was attracted to Sol-Ark's innovations, expertise, and acclaim. And so, Ford—lacking any history in the solar sector and no experience with the manufacture or engineering of hybrid inverters—approached Sol-Ark, cajoling and inducing Sol-Ark to enter into a supply agreement with the promise of substantial long-term revenues, reputational and other benefits. Ford sought critical knowledge and know-how from Sol-Ark that it did not have and could not develop within the accelerated time frames that it faced to catch up to rivals. Instead, Ford found an obvious answer to those market demands – contact the industry leader, Sol-Ark, and seek out its well-known, solar engineering expert and Founder Tom Brennan and the seasoned, sophisticated engineering team he developed at Sol-Ark.

23. So Ford decided, with false and misleading promises and representations, to induce Sol-Ark into a relationship in which it could have Sol-Ark teach it about fundamental solar,

inverter, and energy storage technologies that Sol-Ark and its team had been working on, developing and innovating, for more than a decade.

24. Ford's idea to partner with Sol-Ark was understandable. But the promise of collaboration, mutual benefit and revenue growth was entirely illusory and misleading. Thus, Ford proceeded down a path of inducement and expropriation intended to drain Sol-Ark of its ideas, solutions, and capital and to monopolize, divert, and distract Sol-Ark's management and engineering resources.

**Ford Induces Sol-Ark to Enter One-Sided and Illusory Agreements**.

25. Ford contacted Sol-Ark in the fall of 2022. Ford described its myriad problems to Sol-Ark and asked if Sol-Ark was capable of helping solve those problems.

26. Sol-Ark confirmed that it could help solve Ford's problems and help advance its efforts in the home energy sector using EV technologies and platforms. Applying Sol-Ark's know-how, engineering talents, and market leading technologies to Ford's problems formed the basis for a natural partnership. One that Ford assured would be mutually beneficial.

27. The parties executed a mutual Confidentiality and Non-Disclosure Agreement (NDA) to discuss Sol-Ark's technologies and innovations.

28. The NDA itself noted the well-known fact that Sol-Ark had already developed a hybrid inverter home energy management system and had a long history of developing solar and inverter technologies in the market. Indeed, Sol-Ark's history and knowledge was foundational to Ford's desire to engage with Sol-Ark and initiate discussions.

29. The NDA protected both Sol-Ark's and Ford's confidential information. Like any NDA, it sought to prevent misuse of the disclosing party's confidential information by the receiving party and restricted use by the receiving party to the purpose of the NDA.

30. Sol-Ark and Ford began to collaborate in November 2022. Ford had many problems about which it sought Sol-Ark's expertise.

31. Before the Ford engagement, Sol-Ark had a ten-year history in the development and commercialization of solar, inverter, and energy storage technologies. Because of that history, experience, and market success, and quite simply because that is the entire focus of Sol-Ark's business (unlike Ford), in February and March 2023, Sol-Ark filed provisional patent applications for innovative home energy management systems that allowed for alternate home power sources, including EVs, to be dynamically routed to specific home electrical loads based on user priority.

32. During its multiple interactions and discussions with Ford, Sol-Ark provided to Ford diagrams detailing Sol-Ark's inverter and home energy solutions. Sol-Ark showed Ford how it could successfully implement Sol-Ark technologies and systems in its vehicles' ecosystem to enable bi-directional charging that would optimize and manage electrical loads in a safe and efficient manner. Much other confidential information was communicated in online meetings and through extensive calls from Ford to Sol-Ark's engineering teams, all while the parties were under NDA, but before any supply agreement or work order was in place. And in keeping with the terms of the NDA, Sol-Ark labeled those documents, and the solutions it offered, proprietary and confidential because that information constituted Sol-Ark's intellectual property.

33. Sol-Ark and Ford met regularly, both in person and remotely. Throughout that time and during those conversations, Ford was seeking, documenting, and obtaining the know-how and access to technologies and innovations that it so desperately needed. Ford continued to tell Sol-Ark that it believed a decision on the program and a final decision on Sol-Ark's appointment as a "supplier" for the home energy systems was just weeks away.

**<u>Sol-Ark Solves Ford's Problem while Ford Monopolizes Sol-Ark's Resources and Obtains Know-How</u>**.

34. After the first few interactions with Ford, it was clear that Ford lacked the engineering knowledge and expertise to develop the home energy management system that it desired to sell. Promises were made to Sol-Ark, inflated projections were provided, and a proposed deal worth more than a billion dollars in revenue to Sol-Ark was floated.

35. But while Ford had grand ideas of what it wanted its home energy management system to do, it had no practical or cost-effective way to design and commercialize that system. Ford, therefore, sought to leverage and benefit from Sol-Ark's engineering expertise, industry knowledge, brand reputation within the solar and energy storage markets, and supplier connections. Sol-Ark solved Ford's problems. But the solution was costly, and Ford balked at the cost of full development. Ford's internal projections, based on its inexperience in the field, were *a fraction* of a realistic budget. But with Ford's assurances of a long-term relationship and continued cajoling by Ford, Sol-Ark believed that it would more than recover any engineering, capital and other investments it made once the partnership with Ford went live. And so, with Ford's assurances of a lucrative deal, Sol-Ark invested millions of its own money to further product commercialization.

36. In March 2024, more than a year after sensitive discussions between the companies had started, Ford and Sol-Ark signed a Statement of Work (SOW). Under the SOW, Sol-Ark was designated Ford's supplier for its home energy management system with load optimization. Sol-Ark believed that the system would allow Ford to compete with Tesla and sell more EVs.

37. After signing the SOW, Ford demanded even more access to confidential and proprietary Sol-Ark information: including detailed, highly sensitive and confidential information about Sol-Ark's bill of materials (BOM), supply chain, and supplier part numbers. Sol-Ark held

that information tight to its vest, as do all suppliers and manufacturers—that kind of information is highly confidential because disclosure could eventually allow someone like Ford to copy and build the system itself.

38. Ford demanded to know all the components and parts on Sol-Ark's system circuit boards. Ford demanded details about Sol-Ark's circuitry, software, and firmware. Ford undertook extensive analysis to gain as much information as possible about those materials. After all the time and money spent, Ford identified no meaningful problems with Sol-Ark's design. What it did achieve, however, was full knowledge and access to Sol-Ark's boards and schematics, allowing its engineers to learn the intricate details of Sol-Ark's design, layouts, component selection and electrical schematics.

39. Sol-Ark attempted to resist disclosure to Ford. But Ford was immovable. Ultimately, because of the unlevel field on which the two parties were playing, and because of Ford's leverage and prominent position in the auto market, Sol-Ark had no choice if it wanted to continue its "partnership" with Ford, recover its investment of both time and money, and, possibly, see commercialization of the product. Like many emerging growth technology companies, Sol-Ark had no choice but to acquiesce when a dominant, larger company uses its leverage unfairly and makes unreasonable demands to sustain the relationship.

40. Believing that the NDA would protect Sol-Ark if it complied with Ford's requests, Sol-Ark gave Ford access to the highly sensitive, confidential and proprietary information that Ford demanded.

41. Ford's project monopolized Sol-Ark's time and resources, at times using more than 70% of Sol-Ark's engineering resources and capacity. It caused Sol-Ark to forego other opportunities. It caused Sol-Ark to delay other product development. It prevented Sol-Ark from

developing standalone products that would compete with Ford's product. But Sol-Ark believed that the sacrifice would be worth it, given the relationship with Ford and Ford's promises of significant revenue and long-term profits. It was all pretextual—Ford had other aims and objectives.

**Ford's Scheme Is Put Into Action**.

42. Behind the scenes—after obtaining proprietary information under the NDA and before the SOW was signed—Ford was already misappropriating Sol-Ark's know-how, technologies, trade secrets and intellectual property.

43. On July 13, 2023, Ford employees filed a patent application based on knowledge obtained, extracted and misappropriated, under false pretenses, from Sol-Ark. Ford's July patent application disclosed Sol-Ark confidential know-how related to home energy system load management and optimization.

44. On April 24, 2024, Ford employees filed another patent application based on the knowledge obtained, extracted and misappropriated, under false pretenses, from Sol-Ark. Ford's April patent application disclosed Sol-Ark confidential know-how related to zero crossing algorithms.

45. On May 7, 2024, Ford employees filed another patent application based on the knowledge obtained, extracted and misappropriated, under false pretenses, from Sol-Ark. Ford's May patent application disclosed Sol-Ark confidential know-how regarding the synchronization of multiple power sources in a microgrid during an outage situation.

46. Throughout this period, Ford employees not only secretly filed patent applications but kept pushing Sol-Ark for more and more Sol-Ark confidential and proprietary information. On information and belief, Ford used Sol-Ark's confidential and proprietary information internally

and with other partners to develop a home energy management system, just like the one Sol-Ark had independently developed.

47. In August 2025, Ford began making pronouncements about revolutionary technology that would allow Ford vehicles to act as home generators. Sol-Ark believed that its partnership with Ford was finally coming to fruition. Ford CEO Jim Farley boldly exclaimed that "[i] t will have amazing range. It can power your house for six days. You don't need a generator, you just buy this truck." https://fordauthority.com/2025/08/ford-ceo-jim-farley-says-ev-pickup-will-power-houses-for-days/, which is attached as Exhibit E.

48. About a month later, on September 21, 2025, Ford unceremoniously terminated its relationship with Sol-Ark. Having co-opted and stolen Sol-Ark's solutions and technologies, with patents filed and granted detailing Sol-Ark's inventions, and with untold economic gain to be realized from "Ford's" purported home-power management system, Sol-Ark was no longer necessary. Ford felt it could deliver the home energy solutions without having to pay any fees or compensation to Sol-Ark or reimburse Sol-Ark, as agreed, for Sol-Ark's significant engineering and capital investments.

49. In October 2025, Ford introduced its "Home Power Management (HPM)" system which, according to Ford, was "a groundbreaking feature that unlocks the full potential of your F-150 Lightning." As Ford noted, "[b]idirectional power is possible with all Lightning models with participating utility providers and the purchase of a Home Integration System [that] connects your F-150 Lightning and its charger directly to your home's electrical panel." https://www.ford.com/electric/ev-news/ev-expertise/home-power-management/?intcmp=evNews-cta-news-homePower, which is attached as Exhibit F.

50. Ford characterizes the Home Power Management system as follows: "when the power goes out, there's something called a mid, its micro grid interface device, transfer switch, disconnects you from the grid, seeks power out, and then it tells the truck . . . Once everything's good, it sends power into the house." https://www.forbes.com/sites/edgarsten/2025/10/28/ford-introduces-ev-home-power-system/, which is attached as Exhibit G.

51. But the system is not just a backup power source. The system is designed to reduce a homeowner's overall electric bill by substituting the F-150 Lightning truck's stored power for the electricity the home would normally pull from the grid during peak usage. The Home Power Management system can be programmed to pull from alternate sources instead of the grid during peak times. In other words, the system would manage power sources and optimize load management. Technologies and innovations taught to Ford by Sol-Ark.

52. The Home Power Management system surely sounds impressive. And revolutionary. It is. And it is straight from Sol-Ark's engineers, not Ford's. It is the result of Sol-Ark investment and research. It is the result of hard work done by Sol-Ark engineers over a decade.

53. Ford's innovative and groundbreaking new vision was built on the know-how and technologies Sol-Ark had developed and disclosed to Ford under the guise of a long-term supplier agreement. For years, Ford received information from Sol-Ark regarding the details of its advanced solar, inverter, battery and home energy technologies and know-how. That information was used by Ford to develop a "stolen" Home Power Management system built on misappropriated Sol-Ark technologies for which Ford paid nothing.

54. The very solution that Sol-Ark was hired to provide to Ford was now being passed off as Ford's. Sol-Ark was pushed aside after investing millions of (*unrecouped*) dollars from which Ford has benefitted, devoting thousands of engineering hours to support Ford, and

prioritizing (at Ford's request) its relationship with Ford at the expense of current and prospective customers, clients, and projects.

55. With Sol-Ark's solution in hand and the heft of Ford's balance sheet and marketing teams, Ford has again sought to become relevant in the solar and home energy markets. As of January 2026, Ford has reportedly invested $10 billion in factories and another $2 billion to grow its energy business. https://www.cnbc.com/2026/01/15/ford-gm-tesla-energy-storage.html, which is attached as Exhibit H. And with new factories in not only the United States, but globally as well—including throughout Europe—what was a pipe-dream just a few years ago has become a reality. https://media.ford.com/content/fordmedia/feu/en/news/2023/01/17/ford-announces-new-solar-power-plant-as-further-step-towards-ach.html, which is attached as Exhibit I; https://www.fromtheroad.ford.com/eur/en/article/2025/new-solar-farm-produces-enough-power-for-1500-homes, which is attached as Exhibit J. Ford now seeks to become a legitimate force in the solar and energy markets. The problem—legally and ethically—is that Ford stole Sol-Ark's inventions and know-how in its attempt once again to become relevant.

56. Ford fraudulently induced Sol-Ark to enter into illusory contracts under which it never intended to perform. Ford stood by while Sol-Ark invested in and developed a game-changing home energy management system. Ford improperly and under false pretenses extracted and misappropriated highly confidential, sensitive and proprietary know-how, technologies, trade secrets and other information from Sol-Ark for Ford's benefit and seeks to claim Sol-Ark's intellectual property assets as its own. Not only did Sol-Ark provide the details of its game-changing, patented and patent-pending technologies to Ford, Sol-Ark also provided to Ford highly sensitive, highly competitive information regarding Sol-Ark's BOM, component-suppliers and manufacturing costs. Ford's access to that sensitive, proprietary Sol-Ark information has

accelerated Ford's internal development processes and has given Ford a competitive advantage in the market against not only Sol-Ark, which now will need to compete with its own internally developed technologies, but also other energy storage companies.

57. The story is not unknown or uncommon. The large, slow moving, failing legacy company seeks knowledge, know-how, and access to technologies from the smaller, more agile, more technologically adept company. Ford has taken this unfortunate path, exhibited this deceitful pattern, and engaged in this unseemly enterprise before—only this time Sol-Ark was the unfortunate target.

**COUNT I —VIOLATION OF DEFEND TRADE SECRETS ACT 18 USC § 1836**

58. Plaintiff re-alleges the foregoing paragraphs as if fully set forth herein.

59. On November 7, 2022, Sol-Ark and Ford entered into a Confidentiality and Non-Disclosure Agreement ("NDA").

60. Pursuant to the terms of that NDA, Sol-Ark provided to Ford its detailed confidential and proprietary technical information, (including electrical designs, specifications and schematics, supplier information and contacts), trade secrets (including BOM and component pricing and related information), and know-how (collectively "Confidential and Trade Secret Information"). In the NDA, Ford specifically acknowledges that the project will involve a discussion of Sol-Ark's hybrid inverter home energy management systems and, by such acknowledgement, admits that Sol-Ark had already designed, developed and authored intellectual property, through years of prior investment, in home energy management systems.

61. Sol-Ark's Confidential and Trade Secret Information provided to Ford includes trade secrets protected under the Defend Trade Secrets Act because it was the subject of Sol-Ark's reasonable measures to keep the information secret (including but not limited to the confidentiality

agreements between Sol-Ark and Ford), and derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by others (including Sol-Ark's competitors) who can obtain economic value from the disclosure or use of the information by receiving at least a head start on the development of competitive technology.

62. Ford filed patent applications with the USPTO disclosing Sol-Ark's Confidential and Trade Secret Information.

63. Sol-Ark did not authorize Ford to disclose Sol-Ark Confidential and Trade Secret Information in Ford's patent applications. On further information and belief, Ford failed to disclose to the U.S. Patent and Trademark Office information regarding prior art reflected in the Sol-Ark Confidential and Trade Secret Information or Sol-Ark patent filings.

64. Ford knew, or had reason to know, that at the time it acquired information about Sol-Ark's Confidential and Trade Secret Information, this information was acquired and obtained under circumstances giving rise to a duty to maintain secrecy or limit use, including but not limited to the confidentiality terms in the agreements between the parties.

65. Ford's use and disclosure of Sol-Ark's Confidential and Trade Secret Information constitute actual misappropriation by Ford under 18 U.S.C. §§ 1836 and 1839.

66. Ford has misappropriated Sol-Ark's Confidential and Trade Secret Information by incorporating them into Ford's patent applications and continues to misappropriate those trade secrets by using them to further its business interests.

67. Sol-Ark's Confidential and Trade Secret Information is related to Sol-Ark's products intended for use in interstate or foreign commerce.

68. As a direct and proximate result of Ford's misappropriation and use of Sol-Ark's Confidential and Trade Secret Information, Sol-Ark has suffered and continues to suffer actual

damages in an amount to be proven at trial.

69. If Ford is permitted to continue to use and disseminate Sol-Ark's Confidential and Trade Secret Information, Sol-Ark will be irreparably harmed and the economic damages to Sol-Ark will be difficult to quantify. An injunction prohibiting Ford from further disclosure, use, and possession of Sol-Ark's Confidential and Trade Secret Information is necessary to provide Sol-Ark with complete relief.

70. Ford has been unjustly enriched by the misappropriation and use of Sol-Ark's Confidential and Trade Secret Information.

71. Ford's misappropriation of Sol-Ark's Confidential and Trade Secret Information was willful and malicious, so as to justify an award of additional exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C).

72. Because Ford's misappropriation was willful and malicious, Sol-Ark is also entitled to an award of reasonable attorneys' fees and costs incurred during litigation pursuant to 18 U.S.C. § 1836 (b)(3)(D).

## COUNT II—FRAUDULENT INDUCEMENT

73. Plaintiff re-alleges the foregoing paragraphs as if fully set forth herein.

74. As alleged and detailed above, Ford made material representations concerning the purpose of its overtures directed towards Sol-Ark. In the present case, sometime in 2022, a representative of Ford approached Sol-Ark seeking Sol-Ark's assistance because Ford had no idea how to use EVs, like the F-150 Lightning truck, as a home power source.

75. Enticing Sol-Ark with promises of a long-term supplier agreement, reputational and other benefits, Ford sought Sol-Ark's Confidential and Trade Secret Information only to then take that information and develop a Home Power Management (HPM) system, without Sol-Ark.

76. Ford made such material representations knowing that they were false.

77. Ford made material misrepresentations with the intent to induce Sol-Ark to enter into agreements with Ford and intending that Sol-Ark rely upon those misrepresentations to its detriment.

78. As alleged and detailed above, Ford had no intention of fulfilling its own obligations under the parties' agreements. Rather, Ford induced Sol-Ark to enter into such agreements so Ford could steal Sol-Ark's technical solutions, put those solutions into Ford patent applications, and to obtain Sol-Ark supplier, parts, and costs lists and misappropriate such information for its own purposes to compete with Sol-Ark in a field in which Ford had never before succeeded.

79. Ford fraudulently induced Sol-Ark to enter into the NDA in order to divert and steal Sol-Ark's Confidential and Trade Secret Information so that it could develop a competing business.

80. Ford fraudulently induced Sol-Ark to enter into the 2024 Statement of Work in order to divert and steal Sol-Ark's intellectual property and know-how so that it could develop a competing business.

81. Without a formal contract, Ford would not have had access to confidential and proprietary information regarding Sol-Ark's business, including the Confidential and Trade Secret Information.

82. While Ford represented to Sol-Ark that it desired to enter into a long-term supply relationship, Ford's true motive was to steal Sol-Ark's know-how, intellectual property, and engineering expertise in the solar and hybrid inverter spaces so it could get a leg up for its own current and future business.

83. Thus, Ford made fraudulent misrepresentations to Sol-Ark to induce Sol-Ark to enter into the NDA and supply agreement, misrepresentations that Ford knew were fraudulent.

84. Ford never intended to perform its obligations.

85. Sol-Ark justifiably relied on Ford's representations and suffered injury as a result.

86. Sol-Ark's injuries would not have occurred but for Ford's inducement of Sol-Ark to enter into the agreements between the parties.

**COUNT III—TORTIOUS INTERFERENCE**

87. Plaintiff re-alleges the foregoing paragraphs as if fully set forth herein.

88. Ford approached Sol-Ark intending to induce Sol-Ark to enter into a series of illusory agreements that would require Sol-Ark to devote, at times, virtually all personnel and resources to Ford.

89. At that time, Sol-Ark had numerous ongoing client relationships, sales programs, and product development projects and was forced to divert capital and resources away from, among other things, its Smart Load Program, Microinverters, and 4G and WiFi dongles.

90. Ford knew that Sol-Ark was an earlier stage company with an active and growing client base, and that the agreements Ford was pushing on Sol-Ark would require Sol-Ark to devote a substantial portion of its engineering and management resources to Ford.

91. Ford required Sol-Ark to hand over confidential and proprietary information regarding its BOM, component-suppliers and manufacturing costs that would be used on the Ford project.

92. As alleged and detailed above, Ford had no intention of fulfilling its own obligations under the parties' agreements. Rather, Ford induced Sol-Ark to enter into such agreements so Ford could steal Sol-Ark's technical solutions, incorporate Sol-Ark's inventions

into Ford patent applications and practice Sol-Ark inventions without right or license, and obtain Sol-Ark supplier information and manufacturing cost details with the intent of misappropriating that information for its own purposes to compete with Sol-Ark in a field in which Ford had never before succeeded.

93. The result of Ford's acts and misrepresentations was to cause Sol-Ark to forego active and prospective business relationships. Ford's tortious and unlawful acts prevented Sol-Ark's relationships from occurring.

94. Ford acted with a conscious desire to prevent Sol-Ark's business relationships from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct.

95. Sol-Ark suffered actual harm and damages as a result of Ford's interference.

**COUNT IV—COMMON LAW UNFAIR COMPETITION BY MISAPPROPRIATION**

96. Plaintiff re-alleges the foregoing paragraphs as if fully set forth herein.

97. As detailed above, Sol-Ark is a leading, U.S.-based provider of solar and energy storage solutions for the residential, commercial, and industrial markets.

98. Sol-Ark's business was bootstrapped from the ground up by two entrepreneurs, built on countless hours of work and significant financial investment with the aim of solving important problems in the solar and energy storage industries.

99. Because of Sol-Ark's expertise and reputation, Ford approached Sol-Ark intending to induce Sol-Ark to enter into a series of illusory agreements that would require Sol-Ark to turn over all of its know-how for use in a "joint" endeavor that would provide mutual benefits.

100. Ford required Sol-Ark to provide details concerning its technologies, know-how, and patent-pending inventions. This included diagrams and flow charts as well as working sessions during which Sol-Ark taught Ford about the solar, inverter, and energy storage sectors.

101. Ford required Sol-Ark to hand over confidential and proprietary information regarding BOM, component-suppliers and manufacturing costs that would be used on the Ford project.

102. As alleged and detailed above, Ford had no intention of fulfilling its own obligations under the parties' agreements. Rather, Ford induced Sol-Ark to enter into such agreements so Ford could steal Sol-Ark's technical solutions, incorporate Sol-Ark's inventions into Ford patent applications and practice Sol-Ark inventions without right or license, and obtain Sol-Ark supplier information and manufacturing cost details with the intent of misappropriating that information for its own purposes to compete with Sol-Ark in a field in which Ford had never before succeeded.

103. Ford is now attempting to compete against Sol-Ark, using Sol-Ark's know-how, technologies, and innovations. By misappropriating Sol-Ark's inventions and solutions, Ford is gaining an undue and special advantage because it is burdened with little or none of the expense incurred by Sol-Ark over the course of years of hard work, investment, and research. Furthermore, Ford now has knowledge of, or access to, all of Sol-Ark's suppliers and manufacturers and the price lists associated with each—giving Ford a further advantage to undercut and disadvantage Sol-Ark.

104. Sol-Ark spent extensive time, labor, skill, and money to create its patented and patent-pending technologies and market leading products and to protect its trade secrets.

105. Ford used those technologies and trade secrets and leveraged Sol-Ark's industry knowledge and experience, thereby gaining a special advantage in the marketplace. Ford received a free ride by leveraging Sol-Ark's technologies, trade secrets, and know-how without paying anything for it.

106. Sol-Ark suffered actual harm and commercial damage as a result of Ford's unfair competition.

**COUNT V—MISAPPROPRIATION OF TRADE SECRETS**

107. Plaintiff re-alleges the foregoing paragraphs as if fully set forth herein.

108. On November 7, 2022, Sol-Ark and Ford entered into a Confidentiality and Non-Disclosure Agreement.

109. Pursuant to the terms of that NDA, Sol-Ark provided to Ford its Confidential and Trade Secret Information.

110. Sol-Ark's Confidential and Trade Secret Information provided to Ford includes trade secrets, because those trade secrets were the subject of Sol-Ark's reasonable measures to keep that information secret (including but not limited to the confidentiality agreements between Sol-Ark and Ford), and derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, others (including Sol-Ark's competitors) who can obtain economic value from the disclosure or use of the information by receiving at least a head start on the development of competitive technology.

111. Without knowledge by or notice to Sol-Ark, Ford used Sol-Ark's know-how, design specification, and technical information for its Home Management Platform, leaving Sol-Ark out of the program.

112. Sol-Ark did not authorize Ford to disclose, or use, Sol-Ark's trade secrets in

connection with Ford's Home Management Platform.

113. Ford knew or had reason to know that, at the time it acquired information about Sol-Ark's trade secrets, this information was acquired and obtained under circumstances giving rise to a duty to maintain secrecy or limit use, including but not limited to the confidentiality terms in the agreements between the parties.

114. Ford's use and disclosure of Sol-Ark's trade secrets constitute actual misappropriation by Ford.

115. Ford has misappropriated Sol-Ark's trade secrets by incorporating them into Ford's Home Management Platform and continues to misappropriate those trade secrets by using them to further its business interests.

116. Sol-Ark's Confidential and Trade Secret Information is related to Sol-Ark's products intended for use in interstate or foreign commerce.

117. As a direct and proximate result of Ford's misappropriation and use of Sol-Ark's Confidential and Trade Secret Information, Sol-Ark has suffered and continues to suffer actual damages in an amount to be proven at trial.

118. If Ford is permitted to continue to use and disseminate Sol-Ark's trade secrets, Sol-Ark will be irreparably harmed, and the economic damages to Sol-Ark will be difficult to quantify. An injunction prohibiting Ford from further disclosure, use, and possession of Sol-Ark's trade secrets is necessary to provide Sol-Ark with complete relief.

119. Ford has been unjustly enriched by the misappropriation and use of Sol-Ark's trade secrets.

## COUNT VI—CONVERSION

120. Plaintiff re-alleges the foregoing paragraphs as if fully set forth herein.

121. Ford wrongfully and intentionally exercised dominion over Sol-Ark's proprietary information concerning its home energy management system technologies, including the components, part numbers, suppliers, detailed design specifications, CAD drawings, know-how, and product samples for its home energy management system and associated circuitry. All of this information was put into tangible form by virtue of the documentation Ford required of Sol-Ark for approval. On information and belief, Sol-Ark's intellectual property was used and will be used in proposals provided to Ford's vendors to develop its new energy storage business, which it is heavily investing in as of 2025. Ford has failed to return all the documents that embody Sol-Ark's intellectual property.

122. Ford was not authorized to exercise dominion and control over Sol-Ark's intellectual property. By using that information to develop its energy storage business, Ford has wrongfully denied Sol-Ark the use of its property in a manner consistent with Sol-Ark's rights.

123. Ford's conversion has caused damage to Sol-Ark. Ford's actions described above were taken with malice, fraud, and forethought, and were intentionally done to steal from Sol-Ark the proprietary information in question and to illegally profit thereby. Thus, Ford's actions justify an award of punitive or exemplary damages in favor of Sol-Ark against Ford in an amount to punish Ford and deter such future conduct by Ford and others.

## COUNT VII—UNJUST ENRICHMENT

124. Plaintiff re-alleges the foregoing paragraphs as if fully set forth herein.

125. Ford's acts complained of herein constitute unjust enrichment of Ford at Sol-Ark's expense in violation of Texas state common law.

## COUNT VIII—QUANTUM MERUIT

126. Plaintiff re-alleges the foregoing paragraphs as if fully set forth herein.

127. Sol-Ark provided valuable engineering services, labor, and materials to Ford.

128. Ford accepted and benefited from such services, labor, and materials.

129. Ford knew and had reasonable notice that Sol-Ark expected compensation for its services and materials.

130. Ford failed to and refused to pay Sol-Ark for the services and materials provided by Sol-Ark to Ford. Sol-Ark's labor force, equipment and materials were used to perform work for Ford and delivered at Ford's request and for Ford's benefit and were accepted by Ford with knowledge that Sol-Ark expected to be compensated. Sol-Ark seeks payment of all amounts owed and the fullest extent of statutory interest allowed by law.

131. Accordingly, Sol-Ark is entitled to recovery of damages from Ford under the doctrine of quantum meruit.

132. Sol-Ark seeks its actual damages on its quantum meruit claim.

133. Sol-Ark also seeks its attorneys' fees pursuant to TEX. CIV. PRAC. & REM. CODE § 38.001.

## JURY DEMAND

134. Sol-Ark, under Rule 38 of the Federal Rules of Civil Procedure, demands a trial by jury of any issues so triable by right

## PRAYER

WHEREFORE, Sol-Ark prays for judgment in its favor and against Defendant as follows:

a. An order declaring that Ford and its agents, servants, employees, employers, and all persons acting under, in concert with, or for them, are preliminarily and

permanently enjoined from acts constituting a violation of the Defend Trade Secrets Act;

b. Any other statutory remedies specified in the Defend Trade Secrets Act;

c. A judgment that Ford fraudulently induced Sol-Ark to enter into agreements with Ford (including the 2022 Confidentiality and Non-Disclosure Agreement, General Terms and Conditions, and 2024 Statement of Work) intending that Sol-Ark rely upon those misrepresentations to its detriment, that Ford made fraudulent misrepresentations to Sol-Ark to induce Sol-Ark to enter into those agreements, misrepresentations that Ford knew were fraudulent, that Ford never intended to perform its obligations, and that Sol-Ark suffered injuries and harm as a result of Ford's fraudulent inducement;

d. A judgment that Ford's fraudulent misrepresentations and other acts as described herein were intentional and with a conscious desire to prevent Sol-Ark's business relationships from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct and that Sol-Ark suffered actual harm and damages as a result of Ford's interference;

e. A judgment that Ford misappropriated and continues to misappropriate Sol-Ark's technologies, inventions and solutions to gain an improper, competitive advantage, and that Sol-Ark suffered actual harm and commercial damage as a result of Ford's unfair competition;

f. A judgment that Ford has willfully and maliciously misappropriated Sol-Ark's trade secrets, under Federal and Texas law;

g. A judgment that Ford wrongfully and intentionally exercised dominion over Sol-Ark's proprietary information concerning its home energy management system technology, that it was not authorized to exercise such dominion, and that Ford's conversion caused damage to Sol-Ark;

h. An order requiring Ford to identify, and turn over, any property in its possession, custody, or control containing or reflecting Sol-Ark's Confidential and Trade Secret Information, including hard copy documents or any form of electronic storage media;

i. An order requiring Ford to identify any other persons, entities, or locations not within its possession, custody, or control, to which Ford has transmitted, disseminated, disclosed, or stored any of Sol-Ark's Confidential and Trade Secret Information;

j. An order enjoining and restraining Ford from unfairly competing with Sol-Ark, including an order to cease the sale of Ford's Home Power Management system without payment to Sol-Ark of proper royalties to compensate Sol-Ark for Ford's misappropriation of Sol-Ark's intellectual property;

k. An award of damages adequate to compensate it for Ford's Fraudulent Inducement, Tortious Interference, Unfair Competition by Misappropriation, Misappropriation of Trade Secrets, Violation of Defend Trade Secrets Act 18 USC § 1836, Conversion, Unjust Enrichment, and Quantum Meruit;

l. An award of enhanced damages under 18 U.S.C. § 1836(b)(3)(C);

m. An award of Plaintiff's reasonable attorneys' fees, costs, and expenses pursuant to 18 U.S.C. § 1836(b)(3)(D), TEX. CIV. PRAC. & REM. CODE § 38.001, or as otherwise permitted by law;

n. An order awarding pre-judgment and post-judgment interest; and

o. Such other and further relief at law or in equity as the Court determines is just and proper.

Dated: March 4, 2026

Respectfully submitted,

By: *_/s/ Kevin E. Cadwell_*

Kevin E. Cadwell, *Lead Attorney*
kcadwell@cadwellthomas.com
Texas Bar No. 24036304
Lisa M. Thomas
lthomas@cadwellthomas.com
Texas Bar No. 24079455
Bradley S. Bowling
bbowling@cadwellthomas.com
Texas Bar No. 24040555
**CADWELL THOMAS LLP**
5373 W. Alabama St., Suite 457
Houston, Texas 77056
Phone: (713) 360-1560
Fax: (940) 233-8587

**ATTORNEYS FOR PLAINTIFF SOL-ARK, LLC**